## WIRE WHEEL CORPORATION OF AMERICA v. BUDD WHEEL CO.

(Circuit Court of Appeals, Fourth Circuit. March 31, 1923.)

No. 1997.

1. **Courts ⚖➡347—Any equitable demand may be set up as a counterclaim under federal equity rule.**

   Defendant, under equity rule 30 (201 Fed. v, 118 C. C. A. v), may set up as a counterclaim any equitable demand which he has against the plaintiff, providing a federal court would have jurisdiction of an independent suit in equity on it.

2. **Patents ⚖➡238—Claim for combination not infringed, if one element omitted.**

   There is no infringement, unless the claim can be read on what is said to infringe, and a claim for a combination is not trespassed on if one element be omitted, and if the claim enumerates without qualification several elements, it makes no difference that the description may show that one of them was intended for use in exceptional circumstances only.

3. **Patents ⚖➡167(1)—Patentee may give meaning to words used in his claim.**

   A patentee may, within limitations, give what meaning he chooses to the words he uses in his claim, and resort may be had to the description to determine what that meaning is.

4. **Patents ⚖➡328—1,030,428, for process of manufacturing wire spoke rims, held void and not infringed.**

   Pugh patent, No. 1,030,428, for a process of manufacturing wire spoke rims, or for preparing such rims to receive the spokes, held invalid and not infringed.

5. **Patents ⚖➡328—Reissue 14,461, for driving wheel axle, held invalid and not infringed.**

   Claim 9 of Lindsay reissue patent No. 14,461 of letters patent No. 1,092,494, for a driving axle for automobiles, held invalid for want of invention, and not infringed.

---

⚖➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Cross-Appeals from the District Court of the United States for the Eastern District of Virginia, at Richmond; Edmund Waddill, Jr., and D. Lawrence Groner, Judges.

Bill by the Wire Wheel Corporation of America against the Budd Wheel Company, in which respondent files counterclaim. From the decree, cross-appeals are taken. Affirmed.

Frank P. Davis, of Chicago, Ill. (Clarence S. Walker, of Jamestown, N. Y., and Leake & Buford, of Richmond, Va., on the brief) for appellant and cross-appellee.

Melville Church, of Washington, D. C., and Clarence B. Des Jardins, of Philadelphia, Pa. (Munford, Hunton, Williams & Anderson, of Richmond, Va., on the brief), for appellee and cross-appellant.

Before TAFT, Circuit Justice, and WOODS and ROSE, Circuit Judges.

ROSE, Circuit Judge. [1] The parties to this cause are the Wire Wheel Corporation of America and the Budd Wheel Company, both corporations, the former of New York, the latter of Virginia. For brevity, they will be referred to as the Wire and the Budd. The former filed the original bill below. It alleged infringement by the latter of letters patent of the United States No. 1,030,428, issued June 25, 1912, to one Pugh, as well as of a number of other patents all owned by the Wire. Apparently no attempt was made to establish the allegations of the bill except as to the Pugh patent. The Budd in its answer set up the usual defenses of invalidity and noninfringement and by counterclaim charged that the Wire had knowingly contributed to the infringement of claim nine of reissue No. 14,461, dated April 23, 1918, of letters patent No. 1,092,494, originally issued April 7, 1914, to a certain Thomas J. Lindsay, to which reissue the Budd had acquired title. The Pugh patent related to rims for wire spoked wheels; the Lindsay, to driving axles. There was no connection between the infringement set up in the bill and that charged in the counterclaim. Many courts had held that nothing could properly be made the basis of a counterclaim under equity rule No. 30 (201 Fed. v, 118 C. C. A. v), unless it would have sustained a cross-bill under the old practice. Christensen v. Westinghouse Traction Brake Co. (D. C.) 235 Fed. 898, and cases there cited. The learned judge, however, followed those decisions, such as the Buffalo Specialty Co. v. Vancleef (D. C.) 217 Fed. 91, which took the view that the rule permitted the defendant to set up as a counterclaim any equitable demand which he had against the plaintiff, provided a federal court would have had jurisdiction of an independent suit in equity upon it.

Subsequent to the date of the decree below, but before the hearing at this bar, the Supreme Court had declared that the latter construction of the purpose and effect of the rule is correct. American Mills Co. v. American Surety Co., 43 Sup. Ct. 149, 67 L. Ed. —— decided December 11, 1922. In the instant case, in the court below, the parties finished the trial of the issues concerning one patent so far at least as concerned the presentation of evidence before taking up the other; a course which, under similar circumstances, will usually prove the

more convenient for all the parties concerned. In this opinion, also, the two patents in suit will be separately dealt with.

## Pugh Patent, No. 1,030,428.

The Pugh patent, No. 1,030,428, is for a process of manufacturing wire spoke rims, or more specifically of preparing such rims to receive the spokes. A wire wheel for an automobile requires many spokes. In order that they shall furnish the requisite strength to resist the varied sorts of stresses to which they are subject, they must come to the rim from a number of different angles. It is nevertheless best that they should pass through it without bend or deflection. It follows that the holes punched in it should pierce it, not at one angle, but at many. In actual practice, it is not easy to make holes in a piece of metal of substantial thickness, unless the punching tool is driven into it at what is approximately a right angle to its surface. If the attempt is made under other conditions, there is a chance that the tool will be deflected from the desired direction, or will be subject to undue strain, or both. After the hole is made, the threaded end of the spoke must be drawn into it, and a nipple screwed over it. The head of this nipple may not project above the outer surface of the rim, even slightly, for, if it does, it will speedily destroy the tires. It follows that there must be provided some place below that surface in which it may be housed.

Sufficient room for the heads may be provided by cutting away the metal; but, if that is done, the rim may be weakened at precisely those points at which the strain upon it is most severe. It is desirable to keep water out of the tires, and Pugh wanted to make sure that the nipple heads should have so snug a fit that water could not get through between them and the rim. His method of attaining these various ends was to begin by making hemispherical indentations in the metal of the rims. Every line passing through the center of the sphere of which they formed a part would be at right angles to a line tangent to whatever point on the inner or concave surface of the sphere or indentation through which it was necessary to pierce a hole, and as a practical matter such line would be near enough to a right angle to that surface to insure accuracy of direction and exemption of the punching tool from unnecessary strain. If the indentations are made first and the hole punched through afterwards, there is danger of pushing the metal around the hole out of place or of making its edge broken and irregular. Pugh feared that his process, so far as it has as yet been stated, would not provide a snug seat for the nipple head and a substantially water-tight joint between it and the rim. He accordingly provided for a further countersinking in the portion of the hemispherical indentation lying around the hole. The patent in suit has but one claim. It is for—

"the process of making metal rims for wire spoked wheels in which the spokes are to be inclined at various angles consisting in forming substantially hemispherical concave indentations at the points of location of the spokes, perforating the same on lines radical to the concave surface of the indentations and providing recesses for the heads of the spoke nipples without substantially reducing the thickness of metal at the edges of the holes."

[2, 3] The question raised by this claim is as to whether it is for a two or a three step process. In other words, does it call for making (1) indentations, (2) holes, and (3) recesses, in the order stated, or is its reference to the last named intended merely as a description of one of the uses of the first. It is admitted that all the Budd does is to make the hemispherical indentations and then punch radical holes in them. In no other way are recesses for the nipple heads supplied. It follows that, if the claim is for a three-step process, the Budd does not infringe. Walker on Patents (5th Ed.) § 338, and cases there cited; Royer v. Coupe, 146 U. S. 524, 13 Sup. Ct. 166, 36 L. Ed. 1073. There is no infringement, unless the claim can be read on what is said to infringe. A claim for a combination is not trespassed upon, if one element be omitted (Eames v. Godfrey, 1 Wall. 78, 17 L. Ed. 547); nor is one for a combination of matter, by any substance which does not contain one of the ingredients specified (Otley v. Watkins [C. C.] 36 Fed. 383), unless in either case, the defendant uses an equivalent to that which he left out. If a claim enumerates without qualification several elements, it makes no difference that the description may show that one of them was intended for use in exceptional circumstances only. Otley v. Watkins, supra. In short, a claim cannot be broadened by the description (Railroad Co. v. Mellon, 104 U. S. 112, 26 L. Ed. 639), although it may be narrowed thereby (McClain v. Ortmayer, 141 U. S. 419, 423, 12 Sup. Ct. 76, 35 L. Ed. 800). These rules do not always prevent a patentee from being his own lexicographer. He may, within limits, give what meaning he chooses to the words he uses in his claim, and resort may be had to the description to determine what that meaning is. Blair v. Jeannette-McKee Glass Works (C. C.) 161 Fed. 355.

[4] The claim in suit is for a process. Ordinarily such a claim would be expected to confine itself to a statement of what the process is. It should recite the successive steps in the order in which, in practice, they are to be taken. One who reads this claim for the first time and before examining the description would conclude that it called for three steps: First, the hemispherical indentations are to be formed, then they are to be perforated, and then recesses are to be provided for the nipple heads. The process is not complete unless and until the recesses are formed, and there is nothing in the language of the claim itself to suggest that the patentee intended to tell us that the hemispherical indentations might themselves constitute those recesses. If the claim is to be interpreted as the Wire now insists that it should be, its more natural reading would have been:

"For the process of making metal rims for wire-spoked wheels, in which the spokes are to be inclined at various angles, consisting in forming substantially hemispherical concave indentations at the points of location of the spokes, such indentations providing recesses for the heads of the spoke nipples without substantially reducing the thickness of metal at the edges of the holes, and perforating such indentations in the direction of the required angle of the spokes on lines radical to the concave surface of the indentations."

There is nothing in the description sufficient to put an interpretation upon the claim other than that which its own language naturally suggests. In connection with references to the countersinking, it is true that in the description there are phrases implying that some op-

tion may be exercised; but it is certain that, in most of these, the only choice intended is between the tools with which the countersinking is to be done, and it is by no means clear that any of them have other significance. It follows that in our judgment, the claim is for a three-step process. It is quite probable that, so far as the present suit is concerned, the result would be the same if the claim could be construed to be for a process which includes but two steps. Hemispherical indentations in wheel rims were old. There is little doubt that punching holes in such indentations was a common practice before the date of Pugh's alleged invention.

The Wire may be right in claiming that the prior art patents, which call for hemispherical indentations and for holes, do not specify that the indentation is to be made first and the hole afterwards; but the evidence is overwhelming that, for many years anterior to the date of the application for the patent in suit, metal workers well knew that, if a hole was to be driven through a portion of a piece of metal in which an indentation was also required, good practice demanded that the making of the indentation should precede, and not follow, the piercing of the hole. Under such circumstances, some of the holes punched in these indented hemispheres would follow radical lines, and ordinary mechanical skill would suggest that, if you had a hemispherical indentation into which you wished to punch a hole in a particular direction, you would apply your punching tool to the point at which the hole was to be made in such a way as to approximate to a right angle as nearly as possible. It follows, the learned court below did not err in dismissing the bill of the original plaintiff.

### Lindsay Reissue, No. 14,461.

[5] The Lindsay reissue is for a driving axle for automobiles. The Budd acquired it on January 2, 1919, four weeks before the Wire filed its bill in the present case. The claim in suit is the ninth, and in its present form it first appeared in the reissue, which was not applied for until some four years after the grant of the original patent. This ninth claim is one of 12, all of which, by the reissue, were substituted for the seventh claim of the original patent. The surrendered claim was admittedly invalid, because it covered more than the state of the art justified. It does not appear that any of the successive owners either of the original or of the reissue ever themselves made, used, or sold any axles constructed in accordance with the claim now in suit. It is, however, admitted that, before the application for the reissue, the Wire had contributed to the making of the same kind of axles as those which the Budd now says infringe it. The Budd contends that the inventive idea embodied in the claim was that the internal stresses and strains resulting from the various forces which act upon a wheel and axle could be minimized by bringing the points of their application as nearly as possible into a vertical line. In the Lindsay structure, it is said the outer hub fits over the inner, so that the load is transmitted from the axle casing, through the wheel bearing, to the outer hub, and thence to the inner, all in a straight line; the wheel being so mounted on the inner hub that the plane of the wheel bearing is in line with

the wheel tread, so that the point of contact with the ground is also in line with the wheel bearing. Furthermore, the brake drum is by a flange, carried at the inner end of the hub, so that the braking force is applied close to the plane of load transmission. The structure described in the Lindsay has the further advantage, that the wheel may be removed without disturbing the brake drum. It is admitted that there is nothing new in any of the elements of the Lindsay combination. Invention is said to lie in the novel relation in which they are assembled.

It is interesting to note, in passing, there is nothing to show that when Lindsay applied for his first patent, or at any time during the six years which intervened before he sought a reissue, he had in mind what is now said to be the substance of his invention. If his structure was new, it doubtless makes no difference that he did not himself recognize its chief utility, leaving that to be discovered by the patent lawyers and experts who were using the patent he had obtained to launch a counter offensive against a rival who had attacked its present owner. But was it new? It is conceded that not only were the several parts of the combination old, but that in connection with the full floating axle they had been brought together in a similar fashion. The distinguishing feature of the full floating axle is that in it there is a rigid connection between the drive shaft and the wheel hub. The infringing structure is described as a three-quarters floating axle; that is to say, it is one in which the drive shaft is rigidly connected with the wheel, in which the side thrusts are transmitted to the drive shaft, in which the latter cannot be removed without removing the wheels from the axle and in which the axle casing has an outer bearing over which the wheel hub is sleeved, so that the load is transmitted directly from the axle casing to the wheel hub.

Great industry, ingenuity, and analytical ability have been employed in formulating nice distinctions, in stressing their importance, and in arguing that there was invention in adapting the combination in question to an axle of the particular type, to the making of which the Wire contributed; but they left the court below unconvinced, and have proved no more persuasive here. If the claim in suit is to be so construed as to cover the structure said to infringe, we do not think that there is anything patentable in it, in view of the disclosures of the prior art. This conclusion renders it unnecessary to consider other questions which have been raised and argued, as, for example, whether the reissue had the effect of broadening or narrowing the scope of the original claims and if the latter is the case, whether the Wire had acquired or could have acquired any intervening rights as against even a narrowing reissue.

It follows that the decree below was right, and should be affirmed.