J. STEVENS ARMS & TOOL CO. v. DAVENPORT et al.

(Circuit Court of Appeals, First Circuit. January 2, 1905.)

No. 527.

1. PATENTS—INVENTION—SHELL EXTRACTORS.

The Davenport patent, No. 565,605, for a shell-extracting mechanism for guns, discloses patentable novelty and invention; the device being an advance over the prior art in simplicity, strength, and durability. Also *held* infringed.

Appeal from the Circuit Court of the United States for the District of Massachusetts.

George L. Roberts and Reuben L. Roberts, for appellant.
Wilmarth H. Thurston, for appellees.

Before COLT and PUTNAM, Circuit Judges, and ALDRICH, District Judge.

ALDRICH, District Judge. There were issued to William H. Davenport on August 11, 1896, two patents relating to gun mechanism. One relates to ejecting mechanism, and the other to extracting mechanism. The ejecting mechanism is designed to automatically ex-

tract and eject the empty cartridge shell after the gun has been discharged. In other words, by tilting the barrel the cartridge is thrown out and away, while, under the simpler mechanism described in the extractor patent, the shell is loosened and forced back, so that it can be readily removed by the thumb and finger. The questions which we are to consider relate to the extractor mechanism which partly removes the empty shell, and that mechanism is covered by the Davenport patent, No. 565,605.

Mechanisms involving combinations for removing empty shells are old, but it seems to us that the conception of the patentee in the patent in question was an advance in the art in the direction of simplicity, durability, and certainty of operation under the varying conditions to which a gun may be subjected in actual use. Mr. Davenport declared his object to be "to produce an efficient positive-action shell-extracting device, the parts composing it being comparatively inexpensive, and not liable to become inoperative." We think he accomplished the object in view. After describing the modus operandi of the mechanism, he points out that "it will be seen that the device is positive in its action, both in opening and closing the gun. No springs whatever are employed, and it is comparatively inexpensive to make, and not liable to become inoperative." This we think is clearly so. To accomplish this result, he did what had never been done before, and it was this: He conceived the idea of carrying the barrel-lug so far forward of the pivot-pin on which the barrel of the gun had been secured to the framework in breakdown guns (and on which the barrel had been tilted in the operation of opening and closing the gun, thereby operating upon extracting and ejecting mechanisms in the rear of such pivot), that he might mount an extractor lever upon a pivot of its own in the barrel-lug in rear of the barrel pivot, so shaped and arranged that the mere operation of tilting the barrel in opening the gun would make the lever operate upon the extractor-rod, and through such operation eject the shell, and that the mere operation of reversing the tilt of the barrel and closing the gun would bring all the parts back into normal position. In doing this he discarded all springs, and otherwise simplified the previously existing extracting mechanisms. He reduced the number of parts, and created a combination with parts of greater strength, and one which at once reduced the expense of construction. It is well known that the effects of rust and the effects of dampness and frost, with shotguns in practical use, are less disastrous with mechanisms of strong and simple parts than with extracting mechanisms involving delicate springs and other slight parts. Under the patent in question, the parts are few and strong. The operation is simple and positive. It is this: The movement and operation of the lever upon the extractor-rod result from the fact that the barrel, when tilted forward and downward in opening the breach, forces the under surface of the lower part of the frame into contact with the heel or knee portion of the lever, which, when the gun is closed, extends below the barrel-lug. By means of such contact and resulting force the lever is moved upon its pivot, passing its upper and longer arm rearwardly, and, engaging the forward end of the extractor-rod, slides it endwise and rearwardly, and the head

of the extractor-rod, engaging the rim of the empty shell, forces it from its seat in the barrel.   In reversing the operation, the act of closing the gun forces the head of the extractor-rod against the frame-face; the face of the head of the extractor-rod and that of the frame-face being so shaped that, when the rear end of the barrel is forced into position in closing, the extractor-rod is again forced endwise, but this time forward upon the long arm of the extractor-lever, thus forcing it into normal position, with its heel or knee again below that part of the barrel-lug in which it is pivoted.

We are quite satisfied with the treatment of the prior art by the learned judge below, and are content to leave it there with a single reference to the army revolver, about which considerable has been said in argument.   We do not attach much importance to the extracting mechanism of the army revolver as applied to the extracting mechanism involved in the type of the light shotgun in question.   In the army revolver, it is true, a somewhat similar leverage operating upon the extractor-rod forces it rearwardly and the cartridges out.   Still it clearly differentiates itself in principle and in operation, because, while the barrel is still on its forward and downward tilt, the extractor-rod is thrown back into normal position by a spring.

We think the Davenport invention in question involved patentable novelty.   It is of that class of worthy and sustainable inventions where, by adding a new idea and a new feature in assembling older features of a given mechanism, practically the same result is reached with less expense.   The invention rests in a conception which simplifies complex mechanism and reduces the number of parts, at the same time raising the per cent. of durability and certainty of operation—in other words, in creating a condition of greater durability, and one which is more sure to produce practically the same result in emergencies, and not only with greater certainty, but with less expense.   It is well known among those using guns in the woods in the fall of the year that stiffening waters and sleet are liable to render inoperative guns involving spring mechanism, and to put out of action automatic appliances, unless simple, secure, and strong.

Upon the question of infringement the situation is so plain as not to require discussion beyond that contained in the opinion of the court below.

The decree of the Circuit Court is affirmed, and the appellees recover their costs of appeal.