## POSTAGE METER CO. v. STANDARD MAILING MACH. CO.

(Circuit Court of Appeals, First Circuit. December 7, 1925.)

### No. 1849.

1. **Patents** ☜328—1,365,803, claim 10, held valid and infringed.

Storck patent, No. 1,365,803, claim 10, for envelope sealer, combining feeding means to support and forward envelopes to be operated on, a flap-moistening means, and receiver located immediately adjacent to flap moistener, so as to collect envelopes in a self-sealing stack; held valid and infringed.

2. **Patents** ☜288—District Court had jurisdiction of both subject-matter and parties.

Where subject-matter of suit for infringement of patent involved Judicial Code, § 24, subds. (1), (7), being Comp. St. § 991, with relation to patents, and defendant, even though it had no regular place of business in district of suit and was not inhabitant thereof (Judicial Code, §§ 48, 51 [Comp. St. §§ 1030, 1033]), had consented to jurisdiction, District Court had jurisdiction over both subject-matter and parties.

Appeal from the District Court of the United States for the District of Massachusetts; James M. Morton, Judge.

Suit by the Standard Mailing Machine Company against the Postage Meter Company. Decree for plaintiff, and defendant appeals. Affirmed.

Arthur E. Dowell, of Washington, D. C. (Alexander & Dowell, of Washington, D. C., and Frederick A. Tennant, of Boston, Mass., on the brief), for appellant.

Franklin F. Phillips, Jr., of Boston, Mass., for appellee.

Before BINGHAM and JOHNSON, Circuit Judges, and HALE, District Judge.

HALE, District Judge. This case comes before the court upon appeal from the decree of the District Court for the Massachusetts District, holding United States letters patent to F. W. Storck, No. 1,365,803, of January 18, 1921, to be valid and infringed.

[1] The patent discloses a machine for sealing envelopes, wherein a large number of envelopes are placed in a pile in a feeding hopper and fed successively along a moving belt to a moistening device, inserted between the flap and the body of the envelope, thereby moistening the gummed surface of the flap. As they pass rapidly by the moistener the envelopes are projected into a receiver or stack, wherein they accumulate in a pile. The contact of the envelopes in the stack, with the slight weight, and the lapse of a few seconds, closes the flaps and establishes and maintains contact of the moistened flaps with the backs of the envelopes, so as to seal them.

The plaintiff says that Storck, the inventor, intended the machine of the patent in suit to be an improvement upon his earlier machine which is shown in model F under his patent No. 1,194,568, of August 15, 1916. That machine was equipped with a spring-pressed sealing plate, and was used with a receiving hopper upon which were these directions:

"Sealing: Place the foldable envelope receiving hopper at end of machine corresponding to size of envelopes (see cut). This is important, for owing to the high speed of the standard the glue is not in its best sticking condition whilst the envelopes pass through the machine; hence sealing is not completed until the envelopes are stacked in the receiving hopper and a quick hand pressure applied. Then remove the stack and lay it on the table flapside down. If this instruction is observed and the wick kept clean, we guarantee perfect results."

The idea of the patentee was to eliminate the sealing plate. He tells the story of invention quite clearly in the specification. He says that he knew the practice to provide means for sealing the envelope by pressure of the flap, after moistening, against the back of the envelope, as it passed through the machine, the pressure to be effected either by sealing plate or sealing rollers. He says he found that such means were not sufficient to effectively seal the flap; that he found the sealing could not be done by pressure so well as by contact for a few seconds between the gummed flap and the back of the envelope, in order to give time for the moistened gum to penetrate the paper; and that hence he provided for actual and complete sealing in a receiving hopper where the envelopes are stacked with moistened flaps for a long enough time to permit the weight of the stack to hold the flaps in engagement with the backs of the envelopes; that by eliminating the sealing plate or rollers which had been located between the moistener and the receiving hopper, and placing the hopper immediately adjacent to the moistening means, he could eliminate what he calls "a prolific source of trouble with the envelope sealing machine as such devices, because of their squeezing effect, force the water and gum out from the edges of the flap, and spread them on the back of the envelope, thus causing the mechanism to be fouled with gum so that a frequent cleaning is necessary."

He also calls attention to the fact that the old sealing rollers have the fault of dislocating the flap, especially when filled with bulky inclosures; he says that by his invention he makes a shorter, simpler, and more compact and more cheaply manufactured machine. His invention is set forth in claim 10, as follows:

"10. In a device of the character specified the combination of a feeding means to support and forward the envelopes to be operated upon, a flap-moistening means and a receiver located immediately adjacent to said flap-moistening means to collect the envelopes successively in a self-sealing stack for the purpose specified."

This claim brings before us a machine having three substantial elements in combination: First, a feeding means to forward the envelopes; second, a flap-moistening means; third, a receiver located immediately adjacent to the flap-moistening means, to collect the envelopes successively in a self-sealing stack.

The patentee was endeavoring to produce a machine for rapid sealing of a large number of envelopes. He found that, in the prior art, pressure was thought necessary to effect some part of the sealing, leaving the completion of the sealing to be done in a receiver at the end; as one witness has put it, under favorable auspices and under "favorable climatic conditions," the sealing would be completed before the envelopes reached the end of their journey through the machine. The importance of the receiving hopper at the end of the machine was to supplement the pressure which had been applied as the envelope was on its way

through the machine; and the receiver was regarded as important only from the fact that, at the high speed at which the envelopes were moved, the glue would not stick while the envelopes were passing through the machine, and hence the sealing could not be fully completed until the envelopes arrived at the stack.

The idea of the inventor was to find a means to pass the envelopes through the feeding apparatus and the flap-moistening means as quickly as possible, without attempting to apply any pressure to it, thus greatly increasing the speed of the movement and leaving the whole of the operation of sealing to be effected in the receiving stack; for he had found by repeated experiments that it was not pressure that effected the sealing, especially where that pressure was applied very quickly, but that contact plus a few seconds of time was capable of doing the whole work of sealing. The receiving hopper was the one operating device by which the whole of the sealing was accomplished, thereby avoiding the harmful results of the pressure applied while the envelopes were passing through the machine, and effecting a much simpler and more rapid movement of the envelopes.

Judge Morton held the patent to be valid. In so holding, he gave deference to the opinion of Judge Anderson in this Circuit, in Standard Envelope Sealer Manufacturing Co. v. Graywood Manufacturing Co., 1 F.(2d) 667, in which case Judge Anderson held: "The old use was that of partial utilization of time and gravity in the sealing stack to complete the sealing process, whereas the new use is of utilization of time and gravity pressure in the sealing stack to perform the entire function. * * * He [the patentee] put the whole sealing job upon the stack; whereas before it had been begun in the machine and completed in the stack." "This is a new concept, and, in the plaintiff's machine, is covered by the device in which the sealing stack is put immediately adjacent to the moistening device, thus eliminating any place for a pressure plate." We are of the opinion that Judge Anderson and Judge Morton were right in holding the patent valid.

The patentee was operating in an old art. He found many machines for sealing envelopes. Some of them had been successful. All of them showed means of feeding, for moistening, and for applying mechanical pressure. Stacks had long been used, and in many cases they had been used "to complete the sealing." Patents have been brought before us which involve this use. Both the patented and the unpatented art had used stacks in completing the sealing, but it had always been thought necessary to use mechanical pressure as the envelopes passed through the machine. The old art appears to have assumed that mechanical pressure in a sealing machine is necessary "to bring the flap of the envelope, when freshly moistened, into contact with the body of the envelope, and transmit to that body some of the moisture. This moisture applied to the body of the envelope softens it so that it is more pliable and will become attached to the flap." The patentee had all the prior art before him. He also made many experiments himself. He found in his experiments that, when the machine was operated rapidly, the envelopes were feeding into the sealing hopper with their flaps wide open; that the sealing plate had no sealing effect whatever when it was operated at high speed; and he says: "I then, for the first time, realized that sealing plates on a machine, operated at high speed, were useless; and, when I discovered that, I found a way of greatly simplifying the machine, to make it much shorter and cheaper to construct. One thing was essential: To have a sealing hopper, a stacker, which would always collect the envelopes in a stack so that they could be sealed by their own weight." Here was the plaintiff's inventive thought. We do not find such suggestions anywhere in the prior art, either patented or unpatented.

In eliminating the mechanical pressure instrumentality, the patentee did not eliminate its function. He transferred that function over into the stacker and left the envelopes to make their shorter and more rapid journey through the machine to the receiver. It has been said to attain simplicity is the highest trait of genius; and it cannot be questioned that simplicity is the result of the inventive faculty when it succeeds in dispensing with parts which have long been in use, and which were found to be cumbersome and unnecessary, and when it is found that their function can be performed in a more simple manner by other means.

In Deccco Co. v. Gilchrist Co., 125 F. 293, 298, 60 C. C. A. 207, 212, in speaking for the Circuit Court of Appeals for this Circuit, Judge Putnam said:

"In Richards v. Chase Elevator Company, 159 U. S. 477, 486, 16 S. Ct. 53, 40 L. Ed. 225, the opinion in behalf of the court says that the omission of an element in a combination may constitute invention, if the

result of the new combination be the same as before. The context shows that this conditional qualification was intended to indicate that the result should be at least as effective as before. * * * Like all cases involving the question of invention, these turn on their special circumstances. Lawther v. Hamilton, 124 U. S. 1, 6, 8 S. Ct. 342, 31 L. Ed. 325, related to a patent which was accepted as one for a process. It might as well have been taken out for a machine, but, however this may be, so far as the question we now have before us is concerned, it is unimportant whether for a process or for a machine. There the only claimed invention was the omission of certain muller stones in a machine 'for obtaining the oil from flaxseed. The court held that this was a 'real improvement.' It went further, and held that the result was a new process. Either view of that case—that is to say, that the omission of the muller stones was a mere improvement, or that it resulted in a new process—fits either view of the case before us."

In Lawther v. Hamilton, 124 U. S. 1, 8 S. Ct. 342, 31 L. Ed. 325 to which Judge Putnam referred, Mr. Justice Bradley, in speaking for the Supreme Court, laid stress upon the fact that the invention was shown by the evidence to have been the result of careful and long-continued experiments and the application of much ingenuity. See, also, J. Stevens Arms Co. v. Davenport, 134 F. 869, 67 C. C. A. 495; Davis v. Perry, 120 F. 941, 57 C. C. A. 231.

In the case at bar we have seen that the patentee made careful and repeated experiments before he effected the elimination which he sought.

The machine itself impressed all of us as a remarkably effective and efficiently operating piece of mechanism. The exactness and rapidity of its motion were very noticeable.

We have found the patentee's production to be new. It also proved to be useful. The record shows that it has attained distinct commercial success, that it is used by the United States government and foreign governments and by the great corporations, and that it has been found to be of substantial benefit to the commercial world. Courts have often had occasion to say that commercial success is a substantial reason for deciding upon the patentability of an invention, and often turns the scale in its favor. Barbed Wire Patent, 143 U. S. 284, 12 S. Ct. 443, 450, 36 L. Ed. 154.

In the matter of infringement, the alleged offending machine is the so-called model B, Pitney-Bowes Mailing Machine. The defendant urges that in its machine the receiving stack is not immediately adjacent to the moistening machine. We think Judge Morton was correct in finding:

"By 'immediately adjacent' is meant, as I take it, that there shall be no mechanism tending to seal or press down the flap of the envelope between the moistening mechanism and the receiving stack—in other words, no mechanism the function of which is to seal the flap. So construed, there is no question but that certain of the defendant's machines infringe."

We cannot sustain the contention of the defendant that its machine was intended to be merely a moistener and not a complete sealing machine. It is found that the defendant's advertising circular refers to this machine, stating that it "automatically feeds, separates, seals, prints, and stacks in one operation." We think it must be held to be a sealing machine. We understand Mr. Bowes, the defendant's district manager, to have admitted that it was his practice to demonstrate the machine to customers locally, in Massachusetts, by operating upon the customers' mail, and that this was done in the case of model B machine—the offending machine. It is in testimony that Mr. Bowes operated at a certain place in Boston one of the model B machines. Such use is plainly infringement by the defendant by "using and contributing to the use of the infringing machine." We are constrained to find infringement.

[2] The assignment of errors presents the alleged error that the court erred in holding "that it had jurisdiction of this suit over this defendant," and "that the court erred in holding that the defendant has been, or could properly be, served with any subpœna either original or alias in this suit or within the jurisdiction of said court."

Upon examination of the record, we think there is no merit in these assignments of error, and that the court below was correct in taking jurisdiction and in holding that the service made upon the original subpœna was good and sufficient.

Furthermore, even though the defendant may not have had a regular or established place of business in the Massachusetts district, where the suit was brought, and was not an inhabitant thereof (Judicial Code, §§ 48, 51 [Comp. St. §§ 1030, 1033]), the court in that district had jurisdiction, for the subject-matter involved the statutes of the United States with relation to patents (Judi-

cial Code, § 24, subds. [1] and [7] being Comp. St. § 991); and, consenting, as it did, that the court of the district within which the suit was brought might entertain jurisdiction, that court, not only had jurisdiction over the subject-matter, but of the parties. As was said by the Supreme Court in Panama R. Co. v. Johnson, 264 U. S. 375, 383, 44 S. Ct. 391, 392 (68 L. Ed. 748).

"The case arose under a law of the United States and involved the requisite amount, if any was requisite; so there can be no doubt that the case was within the general jurisdiction conferred on the District Courts by section 24 of the Judicial Code, unless, as the defendant contends, it was excluded by the concluding provision of the act, which says: 'Jurisdiction of such actions shall be under the court of the district in which the defendant employer resides or in which his principal office is located.' Although not happily worded, the provision, taken alone, gives color to the contention. But as a general rule, where existing legislation on a particular subject has been systematically revised and restated in a comprehensive general statute, such as the Judicial Code, subsequent enactments touching that subject are to be construed and applied in harmony with the general statute, save as they clearly manifest a different purpose. An intention to depart from a course or policy thus deliberately settled is not lightly to be assumed. See United States v. Barnes, 222 U. S. 513, 520 [32 S. Ct. 117, 56 L. Ed. 291]; United States v. Sweet, 245 U. S. 563, 572 [38 S. Ct. 193, 62 L. Ed. 473]. The rule is specially pertinent here. Beginning with the Judiciary Act of 1789, Congress has pursued the policy of investing the federal courts—at first the Circuit Courts, and later the District Courts—with a general jurisdiction expressed in terms applicable alike to all of them and of regulating the venue by separate provisions designating the particular district in which a defendant shall be sued, such as the district of which he is an inhabitant or in which he has a place of business—the purpose of the venue provisions being to prevent defendants from being compelled to answer and defend in remote districts against their will. This policy was carried into the Judicial Code, and is shown in sections 24 and 51, one embodying general jurisdictional provisions applicable to rights under subsequent laws as well as laws then existing, and the other containing particular venue provisions. A reading of the provision now before us with those sections, and in the light of the policy carried into them, makes it reasonably certain that the provision is not intended to affect the general jurisdiction of the District Courts as defined in section 24, but only to prescribe the venue for actions brought under the new act of which it is a part. * * * *"

"By a long line of decisions, recently reaffirmed, it is settled that such a provision merely confers on the defendant a personal privilege which he may assert, or may waive, at his election, and does waive if, when sued in some other district, he enters a general appearance before or without claiming his privilege. Interior Construction & Improvement Co. v. Gibney, 160 U. S. 217 [16 S. Ct. 272, 40 L. Ed. 401]; United States v. Hvoslef, 237 U. S. 1, 11 [35 S. Ct. 459, 59 L. Ed. 813, Ann. Cas. 1916A, 286]; General Investment Co. v. Lake Shore & Michigan Southern Ry. Co., 260 U. S. 261, 272, 275 [43 S. Ct. 106, 67 L. Ed. 244]; Lee v. Chesapeake & Ohio Ry. Co., 260 U. S. 653, 655 [43 S. Ct. 230, 67 L. Ed. 443]."

On the whole, then, we are of the opinion that the District Court had jurisdiction; that claim 10 of the plaintiff's patent is valid, and has been infringed by the defendant.

The decree of the District Court is affirmed; the plaintiff appellee recovers costs in this court.