## UTAH RADIO PRODUCTS CO. et al. v. BOUDETTE et al.

### No. 3007.

Circuit Court of Appeals, First Circuit.
June 20, 1935.

Motion to Vacate Decree Denied July 13, 1935.

---

See, also  (C. C. A.)  69  F.(2d)  973.

William H. Davis, of New York City (R. Morton Adams and Theodore S. Kenyon, both of New York City, and Herbert A. Baker, of Boston, Mass., on the brief), for appellants.

George K. Woodworth, of Boston, Mass., for appellees.

George P. Dike, of Boston, Mass., for Philco Radio & Television Corporation, amicus curiæ.

Before BINGHAM, WILSON, and MORTON, Circuit Judges.

BINGHAM, Circuit Judge.

This is a suit in equity alleging infringement of United States letters patent No. 1,855,168, issued April 19, 1932, to Clair L. Farrand, on a divisional application filed October 17, 1929, the original application having been filed April 22, 1926. The Lektophone Corporation, assignee of this patent, is one of the plaintiffs, and the Utah Radio Products Company, a licensee under it, is the other plaintiff.

The defenses are invalidity and noninfringement.

The device in question is a combination of a number of mechanical and electrical elements, and is denominated a dynamic loudspeaker. In the specification, the patentee states that "the invention relates particularly to direct-acting loudspeakers of the cone type whose actuating motor has an armature connected with the apex portion of the cone and which is movable in a path parallel with the pole faces of the field magnet"; that "the motor armature of a dynamic speaker is a coil coaxially connected with the cone and which moves axially in an annular air gap"; that the cone "should be supported so that it has small elastic restoring force and so that it is capable of a large amplitude of movement at low frequencies"; and that it has been found that when the cone is so supported, and when there is no other means of support for the armature coil except what it receives from the cone itself, any lateral displacement of the cone also displaces the coil in its gap, so that it is likely to strike the pole faces and interfere with the operation of the device.

He also states that "the principal object of this invention is to provide a loudspeaker of the above described general type in which the flexible support for the diaphragm [the cone] is supplemented by a special flexible support for the armature, which will permit the armature to move freely in an axial direction but will hold the armature, or assist the flexible support for the cone in holding it, in the proper aligned position in the air gap." He further states that "the cone may be supported in any suitable manner which will give it small elastic reaction and which will permit it to have a large amplitude of movement at low frequencies"; and that the resilient support for the armature coil is "substantially like the resilient support for the cone."

In the form of the device shown "the apex of the cone is connected to a rod 17 by means of the nuts 20" and "the armature coil 8 is also connected to this rod by means of the spider 16." The rod 17 to which the cone is clamped is supported in the frame or casing by flexible rods 24 at the apex of the cone and flexible rods 25 at the base of the cone. The edge portion of the periphery of the cone is connected to the rod 17 by a number of radial cords or wires 26. The coil 8 is mounted on a core of insulating material connected with the spider 16 which connects the coil to the rod 17. The coil 8 is located and operated within an annular air gap between the poles of the electric motor which operates the device.

The patent contains five claims of which claims 1, 2, and 5 are in issue, and read as follows:

"1. A loudspeaker comprising a direct-acting cone, supporting means for the cone located substantially at the plane of the base of the cone and having · flexibility to permit axial vibration of the cone, an actuating motor having a field magnet structure provided with pole pieces having opposing faces which form an air gap, an armature connected with the apex portion of the cone and movable between the pole faces within the air gap and in a rectilinear path parallel with the pole faces, and supporting means for said armature in addition to said supporting means for the cone, said armature supporting means having flexibility to permit vibration of the armature in its path parallel with the pole faces but adapted to hold the armature against displacement in all directions at right angles to said path.

"2. The combination of a direct-acting cone which is free to vibrate axially with negligible elastic reaction, an armature connected with the apex portion of said cone, a field magnet structure having pole pieces whose faces form an air gap in which said armature moves in a path parallel with said faces and parallel with the axis of the cone, and a flexible support for armature located adjacent to it and permitting free axial vibration of the armature while preventing its displacement in all radial direction."

"5. A loudspeaker comprising a direct-acting cone, a flexible support for the cone permitting it to vibrate axially, an actuating motor comprising a field magnet structure having pole faces forming an annular air gap and an annular armature connected with the apex portion of the cone and reciprocable axially in said gap between said pole faces, and a support for the armature having flexibility to permit vibration of the armature in the direction of its axis but adapted to hold the armature against displacement in all radial directions."

These are broad claims for a double support for the cone and armature unit of a dynamic loudspeaker and are not limited to the specific methods of support disclosed in the specification. Claim 1 calls specifically for supporting means for the armature as well as for the cone, while claim 2 calls for a flexible support for the armature. This flexible support for the armature is located adjacent to the cone to enable it to vibrate axially and to prevent radial displacement. Although this claim does not call for a flexible support for the cone, it does provide that the cone shall be "free to vibrate axially with negligible elastic reaction," and such a support is necessary for the cone to attain that quality. This quality of negligible elastic reaction is undoubtedly also possessed by the cone called for in claims 1 and 5 with flexible supports, for the specification states that "the resilient support for the cone may take other forms than that herein disclosed, but it should preferably be substantially at the plane of the base of the cone and should permit the cone to vibrate freely in an axial direction with small elastic reaction." These claims are, therefore, substantially the same.

The three claims being substantially the same, each is a combination of five elements: (1) A direct-acting cone; (2) a voice coil or armature; (3) a field magnet structure having pole pieces, the opposing faces of which form a small air gap in which the voice coil or armature floats; (4) supporting means at or near the apex of the cone to support the voice coil or armature, of such a character as to permit the armature to vibrate axially, but prevent radial displacement; and (5) supporting means at the base of the cone flexible enough to permit the cone to vibrate axially, but retain its position radially.

Now as to the prior art. A direct-acting cone of the character here in question was old. It was first invented by Hopkins as shown by a patent issued to him, No. 1,271,529, July 2, 1918. The object of that invention was "to regenerate the original sounds directly, * * * without interposition of a confined body of air [as in a sound box] and without the employment of a restrictive transformer such as a horn." It also had a flexible rim adapted to maintain its form and neutral position, but to yield sufficiently to permit axial motion. Lektophone Corporation v. Sylo Lighting Fixture Co. (C. C. A.) 16 F.(2d) 7. So a direct-acting cone with a flexible support at the base was old. This cone of Hopkins was at first used by him in a phonograph and was operated mechanically, not electrically.

The British patent to Siemens, No. 4,685, of 1877, disclosed an electrical dynamic motor used to actuate a diaphragm in telephone receivers; and the British patent to Brown, No. 29,883, of 1910, disclosed an electrical dynamic motor as applied to a conical diaphragm in telephone receivers, in which the conical diaphragm or cone was positioned by a flexible support, a reed, at its apex, to which reed the armature of the motor was also attached. This patent also disclosed a flexible connection between the periphery of the cone and the casing or support for the device. A study of the patent indicates that this flexible connection was not intended as a support for the cone, but as an air barrier, the cone being rigidly attached at its apex to the flexible reed which controlled its movement. The value of this patent on the question of invention here under consideration is important only as showing a flexible support for the voice coil or armature at

or in the region of the apex of the cone and the 'use of an electrical dynamic motor in such a structure.

Early in 1921 Farrand devised, and, on April 23 of that year, applied for a patent for a loudspeaker having a direct-acting cone of the Hopkins type and an electrical dynamic motor of the Siemens and Brown type, the voice coil or armature of which was attached to the apex of the cone. The cone had a single flexible support in the neighborhood of the periphery of its base. In that device the electrical dynamic motor was located within the concave side of the cone near its apex. Some time after the original application of April 23, 1921, a divisional application was filed on which letters patent No. 1,847,935 were issued to him in 1932 and covers the device spoken of in this record as the Phonetron.

It appeared in evidence that the Phonetron went into public use in May, 1921. Farrand himself testified that he had a definite recollection of "the Continental Radio and Electric Corporation selling the Phonetron in May and June and July," 1921, and that he "sold them through an electrical concern in New York City called the Continental Radio and Electric 'Corporation, and that they advertised them in a circular in May 1921."

■ The original application for the patent in suit was not filed until April 22, 1926, and its divisional application was not filed until October 17, 1929. Farrand testified that he reduced to practice the invention of that application in May, 1921, but there was no corroborating evidence produced in the way of models or records showing that it was reduced to practice in May. He testified that he disclosed his invention and made a demonstration of it to Bryan Battey, a lawyer in New York, and to Edwin H. Armstrong, an engineer, at his home in Stamford, Conn. Neither of these witnesses was called by the plaintiffs to corroborate his testimony and fix the demonstration as in May. It was stipulated, however, between the parties that Bryan Battey, if called as a witness, would testify that in the summer of 1921 Farrand disclosed to him and Armstrong the device of the patent in suit. If the plaintiffs and Farrand desired a date of invention earlier than that of April 22, 1926, when the original application was filed, it was incumbent on them to show that

fact by documentary proof and exhibits supported by testimony of corroborating witnesses of at least a 'clear and convincing character. This they did not do. The stipulation does not support the claim for a date as early as May, for the stipulation is that the disclosure was in the summer of 1921, which we regard as later than May.

In the District Court little consideration appears to have been given to this question, for, in one place, the court speaks of the date of Farrand's present invention as being "not earlier than the summer of 1921," and at another place as being in May. But on the evidence we find that it was after May, and that the device of the Phonetron, having gone into public use in May, is prior art.

■ As above pointed out, the Phonetron device embodied all the elements, mechanical and electrical, of the claims in suit, except the flexible support in the region of the apex of the cone and of the armature or voice coil of the motor, and the question is whether, if the dynamic motor is changed from within the cone to its outer side and the armature is then connected to the apex of the cone, it was invention to make use of a second flexible support in the region of the apex or armature, such support being of the same character as that employed at the base when the motor is positioned within the cone, or whether it was a mere mechanical expedient which a person skilled in the art might do. It seems to us that it was the latter; that as the base was supported flexibly to allow axial but to prevent radial movement—a problem well understood—it was not invention to supply a support of the same character in the region of the apex and armature to allow axial but prevent radial movement.

We do not find it necessary to discuss what negligible elastic reaction is. It is perfectly apparent that the Phonetron device, as well as the device of the patent in suit, possessed that quality, for in the specification of the Phonetron patent it is outlined as a function of the device. It is there said:

"A loudspeaker constructed as herein disclosed, that is, one having a direct-acting diaphragm comprising a substantially rigid central portion connected to a support by a flexible rim and actuated by an armature co-axially connected with the rigid portion of the diaphragm and mov-

ing in a path parallel with the polar faces has the following important advantages; the total elastic restoring force, localized in the diaphragm and its flexible rim, may be kept down to that small and predetermined value that will cause the diaphragm to produce the sound waves directly in the surrounding air without sensible resonant distortion. In other words, the fundamental period of the tympanum will lie far down in the working range of frequencies. The armature by reason of its freedom from elastic restoring force of its own, adds nothing to the elastic restoring force of the diaphragm and does not upset or disturb the advantageous characteristics of the diaphragm."

But apart from all that has been said, we are of the opinion that the patentee, because of his delay, without adequate excuse, in applying for claims for a double support for more than four years after a dynamic loudspeaker having a double support had become known and gone into public use, forfeited any and all rights under the patent which he otherwise would have had, and that the plaintiffs, the Lektophone Corporation, as assignee of the patent, and the Utah Radio Products Company, its licensee, acquired no rights thereunder.

It appears that the alleged invention of the patent in suit was devised at least as early as the summer of 1921; that Farrand delayed filing an application for it until April 22, 1926; that none of the claims, original or amended, down to the filing of a divisional application (October 17, 1929), claimed a double support, although the original application disclosed means therefor, and all of the claims so filed prior to October 17, 1929, were either in terms specifically limited to an unconstrained or free edge periphery or were necessarily so limited by the nature of the elements claimed; that he delayed filing a divisional application until October 17, 1929; that on the filing of the divisional application the claims for a double support as hereinabove set forth first appeared; and that in November, 1925, about four years prior to October 17, 1929, a dynamic loudspeaker device, known as RCA loudspeaker 104, embodying double flexible supports, one at the base and another in the region of the apex or armature, was made and went into public use.

In Webster Electric Co. v. Splitdorf Electrical Co., 264 U. S. 463, 44 S. Ct. 342, 345, 68 L. Ed. 792, the plaintiff, the Webster Company, brought suit on claims 7 and 8 of patent No. 1,280,105, issued to it as assignee of Kane September 24, 1918, alleging infringement by the defendant. The original application was filed February 3, 1910. In 1915 the patentee filed a divisional application, copied nine claims from Podlesaks' patent of March 4, 1913, and was put in interference with them. Priority as to all these claims was awarded to the Podlesaks. June 17, 1918, Kane amended his divisional application and inserted two new and broader claims, being claims 7 and 8 sued on. These claims were presented for the first time eight years and four months after Kane's original application was filed and five years after the date of the Podlesaks' patent (March 4, 1913). The Podlesaks' patent disclosed the subject-matter of claims 7 and 8, and the device of those claims had been in general use for five years after that patent issued (March 4, 1913); and during this time Kane and his assignee, so far as the subject-matter of claims 7 and 8 was concerned, had stood by and awaited developments.

In the Circuit Court of Appeals (283 F. 83) the plaintiff's bill was dismissed. In the Supreme Court, the decree of the Court of Appeals was affirmed.

The subject-matter of claims 7 and 8 having been disclosed in Kane's original application of February 2, 1910, the court found that the delay of five years after the Podlesaks' patent issued in 1913, disclosing the same subject-matter, was unreasonable, and that there were no circumstances justifying the delay. It pointed out that Kane apparently did not originally or until 1918 intend to assert claims for the subject-matter covered by claims 7 and 8; that "the final determination to do so was an exigent afterthought, rather than a logical development of the original application"; and that "the repeated assertion of interferences in narrower terms, resulting in delays incident to their determination, affords no just excuse for the failure to assert the broader claims, 7 and 8, at an earlier date," which they could have done as readily and easily at an earlier date as in 1918; and that "the petitioner [the plaintiff] lost whatever rights it might otherwise have been entitled to."

In that case the court applied by way of analogy the statutory two-year period of prior publication and public use, as they did in re-issue cases, and in summing up said:

"Our conclusion, therefore, is that in cases involving laches, equitable estoppel or intervening private or public rights, the two-year time limit prima facie applies to divisional applications and can only be avoided by proof of special circumstances justifying a longer delay. In other words, we follow in that respect the analogy furnished by the patent reissue cases."

There the subject-matter of claims 7 and 8, though not claimed in the Podlesaks patent, was disclosed by it, and, consequently, on the issuance of that patent in 1913, was published and given to the public.

In the case now before us, the subject-matter of claims 1, 2, and 5 here in issue was known and in public use through the sale of RCA loudspeaker 104 in November, 1925, some four years before claims 1, 2, and 5 were asked for, whereas they reasonably could have been inserted in the original application of April, 1926, or at any time thereafter up to two years from November, 1925, but were not until October 17, 1929, when the divisional application was made.

■ The plaintiffs and the patentee seek to excuse the delay on the ground that the application for the Phonetron patent was pending in which they were seeking broad claims. But that was an independent proceeding and did not involve the subject-matter of claims 1, 2, and 5, and no claims for a double support could have been asserted in the Phonetron application, for that application did not disclose a double support. If the patentee desired the broad claims here in question for a double support, he could only have obtained them in the original or division-application of the patent in suit, and the suggested excuse is no excuse.

■ This is a case of laches, not of abandonment. To prove abandonment it is necessary to show an intention on the part of the inventor to abandon or give the subject-matter to the public; but where laches—unreasonable delay—is the issue, the intent is unimportant, and especially so where public rights have attached pending the delay.

■ The two-year period, as held in the Splitdorf Case, is not a fixed period as to reissues and divisional applications, but a delay beyond that period constitutes a prima facie case and casts the burden upon the plaintiff of showing circumstances justifying an extension of the period. This burden has not been sustained and the decree of the District Court must be affirmed for this reason as well as for non-invention.

■ As heretofore pointed out, the plaintiffs' bill is for infringement of claims 1, 2, and 5 of letters patent 1,855,168 of April 19, 1932. In it the Utah Radio Products Company, one of the plaintiffs, is alleged to be a corporation organized under the laws of Illinois and a resident and inhabitant of that state, having its principal office and place of business in Chicago, Ill.; and the Lektophone Corporation, the other plaintiff, is alleged to be a corporation organized under the laws of Delaware having its principal office and place of business in Jersey City, N. J. The defendants, Reuben T., Clayton M., Laurice F., and Milton R., Boudette, are alleged to be individuals doing business under the name and style of Boudette & Co., and having a regular and established place of business in the city of Chelsea within the District of Massachusetts, and the acts of infringement complained of are alleged to have been committed within the District of Massachusetts and elsewhere within the United States.

The defendants' answer contains a counterclaim in which, after setting out that they and their predecessor had been engaged since 1922 in the manufacture of loudspeakers for radio receiving sets and had acquired a valuable good will for their product which they marketed throughout the United States and chiefly in the city of New York, they allege that the plaintiffs jointly and severally had, by unlawful business practices, entered upon a campaign of intimidation and harassment of defendants' customers, seeking to have them discontinue business relations with the defendants and become customers of their own, by various acts of intercession and by bringing suits for infringement of their patent No. 1,855,-168 against retailers of radio sets containing the defendants' loudspeakers, with the purpose of harassing and intimidating defendants' customers so that they would not make use, or continue to make use,

of defendants' loudspeaker; and it was further alleged that by reason of said acts the defendants had been irreparably damaged, and, unless such acts were enjoined, damage to the defendants would be continuously increased. The prayer was that the plaintiffs and their agents be enjoined permanently and pendente lite from bringing further suits against defendants' customers or the customers of defendants' customers for alleged infringements of their patent, and from proceeding further with the suits then pending and for an accounting.

The plaintiffs filed an answer to the counterclaim which was a denial of its main allegations.

The plaintiffs now insist that the counterclaim is fatally defective in that it neither alleges facts showing diversity of citizenship or jurisdictional amount necessary to bring the cause set up in the counterclaim within the jurisdiction of a federal court. They concede that if the subject-matter of the counterclaim was one arising out of the subject-matter of their bill, a federal court would have jurisdiction of the counterclaim. But their contention is that the matter involved in the counterclaim is distinct and unrelated to the subject-matter of the plaintiffs' bill; that the counterclaim is a suit to recover damages for unfair trade practices entered upon in an endeavor to deprive the defendants of their customers, while the subject-matter of the plaintiffs' bill is the infringement of their patent. Frankart, Inc., v. Metal Lamp Corporation (D. C.) 32 F.(2d) 920, 922; Vacuum Cleaner Co. v. American Rotary Valve Co. (D. C.) 208 F. 419.

We think that the subject-matter of the counterclaim in this case is not a related matter arising out of the infringement of plaintiffs' patent which could be set up in defense by way of recoupment, but is an independent and unrelated matter which, but for Equity Rule 30, 28 USCA following section 723, would require a cross-bill; that, being an independent and unrelated matter of which the District Court would have jurisdiction only in case there were diversity of citizenship and the necessary amount involved, exclusive of interest and costs, the plaintiffs' motion to dismiss the counterclaim should have been granted.

It does not appear from the counterclaim or the plaintiffs' bill where the defendants reside; their residence and citizenship is nowhere alleged in the counterclaim, and in the plaintiffs' bill it is simply alleged that the defendants are a partnership having a regular and established place of business in the District of Massachusetts. Furthermore, the counterclaim entirely fails to state the required jurisdictional amount.

This case is not controlled by our decision in Krentler-Arnold Hinge Last Company v. Leman, 13 F.(2d) 796. The subject-matter of the counterclaim in that suit was the infringement of a patent owned by the defendant. The jurisdiction of the federal courts over a patent suit or such a counterclaim does not depend upon the citizenship of the parties or the amount involved, for over such a controversy the federal courts have jurisdiction by virtue of a statute of the United States relating to patents. See Judicial Code, § 24, subds. (1) and (7), 28 USCA § 41 (1, 7).

Where a federal court has general jurisdiction over the subject-matter, as in a case brought for infringement of a patent, the court before which the suit is pending may acquire jurisdiction over the person of the defendant in a district other than that in which he is an inhabitant or has a regular and established place of business by his appearing and thus consenting to litigate the cause, for that concerns the venue or place of trial and not the general jurisdiction of the court. Postage Meter Co. v. Standard Mailing Mach. Co. (C. C. A.) 9 F.(2d) 19, 22, 23; Parker Pen Co. v. Rex Mfg. Co. (D. C.) 11 F.(2d) 533. But where its general jurisdiction depends upon diversity of citizenship and the amount involved, and the subject-matter set up in a counterclaim is independent of and unrelated to that set up in the plaintiff's bill, the jurisdictional facts must be alleged the same as in an original suit. See Wire Wheel Corporation v. Budd Wheel Co. (C. C. A.) 288 F. 308; Postage Meter Co. v. Standard Mailing Mach. Co., supra; Frankart, Inc., v. Metal Lamp Corp. (D. C.) 32 F.(2d) 920.

The defendants' counterclaim should have been dismissed for want of jurisdiction, and such will be the order here.

The decree of the District Court is affirmed so far as it relates to the validity of the patent in suit; but so far as it relates to the counterclaim, it is set aside, and as to that the order is: The coun-

terclaim is dismissed for want of jurisdiction. Neither party recovers costs in this court.

## MORTON, Circuit Judge.

I concur in the foregoing opinion except the disposition which is made of the defendants' counterclaim. It does not seem to me just to reverse the judgment upon it and order a dismissal of it upon a defect in pleading which was not raised, so far as the record shows, in the court below nor called to the defendants' attention there. It seems probable that the facts were such as to give jurisdiction, and that if the defect in pleading had been called to the defendants' attention at the trial, it could have been cured by amendment. In my opinion, the decree on the counterclaim should be vacated, and the counterclaim should be returned to the District Court, with leave to plaintiff to amend the jurisdictional allegations, if so advised, and if such an amendment be made, for such further hearing on the question of jurisdiction as may be necessary.

## On Motion to Vacate Decree and to Amend Record.

### BINGHAM, Circuit Judge.

The defendants, counterclaimants, have filed a motion to vacate our decree of June 20, 1935, dismissing their counterclaim for want of jurisdiction, and to amend the same to show that the defendants are citizens and residents of Massachusetts and that the amount in controversy therein exceeds, exclusive of interest and costs, the sum or value of $3,000.

In support of this motion the defendants contend that, in this appellate court, they have the right to have such amendment made by virtue of section 399, title 28 USCA (Judicial Code, § 274c; Act of March 3, 1915, c. 90, 38 Stat. 956), or, if not, this court in its discretion may allow such amendment.

Section 399 provides:

"§ 399. (Judicial Code, section 274c.) Amendments to show diverse citizenship. Where, in any suit brought in * * * any district of the United States, the jurisdiction of the district court is based upon the diverse citizenship of the parties, and such diverse citizenship in fact existed at the time the suit was brought * * * though defectively alleged, either party may amend at any stage of the proceedings and in the appellate court upon such terms as the court may impose, so as to show on the record such diverse citizenship and jurisdiction, and thereupon such suit shall be proceeded with the same as though the diverse citizenship had been fully and correctly pleaded at the inception of the suit. * * * *"

In the counterclaim filed in this suit, the subject-matter of which is independent of and unrelated to that set up in the plaintiff's bill, there were no allegations of any kind or description as to the defendants' citizenship and residence or as to the amount involved, and there is no evidence in the record showing their citizenship and residence or the amount involved.

It thus appears that none of the facts essential to federal jurisdiction were even "defectively alleged" in the counterclaim, if, under the statute, they must be at least "defectively alleged" to authorize the defendants, as of right, to amend.

Then again the plaintiffs contend that section 399, 28 USCA (section 274c of the Judicial Code), only authorizes an amendment showing diversity of citizenship of the parties and not one showing that the amount involved exceeds, exclusive of interest and costs, $3,000.

In Northern Trust Co. v. Anderson (D. C.) 5 F. Supp. 390, 391, the court, in speaking of section 399, said:

"This section * * * is limited in the right which it gives for filing amendment to show diversity of citizenship, and it has nothing to do with a right of a party * * * to allege facts to create for the first time jurisdiction upon the court where it had not theretofore existed."

The court also added that it was satisfied that the section "applies only to amendments to show diversity of citizenship where the face of the pleading did not clearly or fully so show"; that facts showing diversity of citizenship must have been at least "defectively alleged" to authorize an amendment under section 399.

But whatever may be the answer to these matters, we are of the opinion that, this court being an appellate court and without authority to receive evidence, and there being no evidence in the record showing the citizenship and residence of the defendants or the amount involved, the application to vacate our decree and to amend must be denied.

The motion is denied.