414 F.2d 1254
 The INTERNATIONAL PAPER BOX MACHINE COMPANY, Philip D. Labombarde and Raymond A. Labombarde, Plaintiffs, Appellants,
v.
SPECIALTY AUTOMATIC MACHINE CORPORATION and Machinery Rebuilders, Inc. (doing business as Maverick Box Machinery Company), Defendants, Cross Appellants.
 No. 7287.
 No. 7288.
 United States Court of Appeals First Circuit.
 Heard May 16, 1969.
 Decided August 1, 1969.
 
 Thomas Cooch, Cambridge, Mass., with whom Robert F. O'Connell, Boston, Mass., was on brief for The International Paper Box Machinery Co. and others.
 Cedric W. Porter, Boston, Mass., with whom Robert E. Meyer and Porter & Meyer, Boston, Mass., were on brief, for Specialty Automatic Machine Corp. and others.
 Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.
 COFFIN, Circuit Judge.
 
 
 1
 These are cross appeals from a patent infringement suit. Plaintiff-appellant International Paper Box Machine Company is the owner by assignment of the two patents in suit — United States patent No. Re. 25,792 (a reissue patent based on originally issued patent No. 3,070,457) and United States patent No. 3,202,532. These patents were issued to the other two plaintiffs-appellants Philip D. Labombarde and Raymond A. Labombarde, who are brothers, high officers and majority stockholders of International. All plaintiffs will hereafter be referred to collectively as "International". Defendant-appellee and cross-appellant Specialty Automatic Machine Corporation and Machinery Rebuilders, Inc. manufacture paper box blank coating machines while defendant-appellee and cross-appellant Maverick Box Machinery Company sells such machines under an exclusive agreement with Specialty. Defendants-appellees and cross-appellants will hereafter be referred to collectively as "Specialty".
 
 
 2
 We shall deal with each patent separately.
 
 
 3
 The Philip Labombarde patent, No. Re. 25,792.
 
 A. Factual Background
 
 4
 This patent covers a machine for producing highly glossed wax coated carton blanks used to make paper boxes. The wax surface not only makes the boxes waterproof, but also gives the boxes an attractive appearance, appealing to consumers. The high gloss is produced by reheating a previously applied heated wax coating, followed by a quenching shower of coolant from a low waterfall. The reheating results in remelting and liquefying of a layer of wax coating on the top side of the box blank into a mirror-like pool while the quenching results in hardening the remelted and liquefied layer, without marking it.
 
 
 5
 Although Philip Labombarde had previously done some experimentation with the concept of reheating and quenching in order to obtain a high gloss, the appearance and success of the Glamakote process (developed by another manufacturer) in 1957 and 1958 spurred him on to concentrate his efforts on obtaining a gloss comparable to that achieved by Glamakote. By mid-1959 International had designed a commercial paper box coating machine involving the reheating and quenching concept. This design involved a sluice type water box, i.e., a rectangular water box which had an aperture near or at its bottom and a shelf positioned substantially adjacent to such aperture. The waterfall was produced by the water in the box flowing through the aperture and then falling from the shelf under the sole force of gravity.
 
 
 6
 International first sold its sluice machine, in the form of a Model PL-019, to Burd and Fletcher on August 5, 1959. On December 28, 1959 Philip Labombarde first filed a patent application disclosing his reheating low waterfall quenching structure. A patent was issued on December 25, 1962. The 1962 patent, however, as was later discovered, did not precisely describe the Burd and Fletcher machine, because that machine lacked an element — "smoothing zone 23" — of the patent.
 
 
 7
 Meanwhile, in 1958-1959, the Oakland Paper Box Company, like Philip Labombarde, was also working on the development of a paper box blank wax coating machine. Oakland succeeded in converting an earlier International machine into a machine which used a preheating structure coupled with a water dip tank immersion quenching structure. Oakland shipped a similar machine to the Waldorf-Paper Products Company on September 29, 1960. Waldorf, however, had some difficulties with this machine and, on Waldorf's suggestion, Oakland, in January 1961 began experimenting with machines using redirect heat and a sluice type of quenching device under some pressure. Between June and October 1961 Oakland sold 14 machines utilizing a reheating and waterfall type of quenching structure.[1] In October 1961, Specialty Automatic Machine Company entered into an agreement with Oakland to purchase rights to manufacture the machine. Shortly thereafter, Specialty and Maverick entered their exclusive manufacture-sell agreement and in April 1962 Specialty sold its first machine.
 
 
 8
 In January 1963 International notified Specialty that it was infringing its newly-issued (December 1962) patent. Specialty then ceased using the sluice type water tank, converting to weir tanks — tanks circular in cross-section, one quadrant of which was open at the top to allow water to spill out over a shelf attached at the edge. In May 1963 Specialty's attorneys notified International that this conversion had been made to avoid infringement. By November 1963 all machines sold by both Specialty and Oakland had been converted to weir types.
 
 
 9
 In May 1963 International applied for the reissue of its patent. Two new claims were filed, 13 and 14, which broadened the original patent by omitting the limitation "having a continuous narrow emission aperture" in order to cover the weir tanks. In June 1965 the Philip Labombarde patent was reissued.
 
 B. Proceedings
 
 10
 (1) Before the Patent Office
 
 
 11
 Application for the original Philip Labombarde patent was filed on December 28, 1959. The Patent Examiner rejected all claims on August 5, 1960. Philip Labombarde filed numerous amendments on January 16, and on September 6, 1961. On November 3, 1961 the Examiner again rejected the application. Another amendment was filed on May 3, 1962 and, on June 11, 1962, the Examiner allowed some claims. Further amendments were then made and a Notice of Allowance was subsequently issued. The patent itself issued on December 25, 1962.
 
 
 12
 The reissue application, filed on May 15, 1963, emphasized that the applicant had inadvertently limited its original claims by inserting the limitation "narrow emission aperture". New claims 13 and 14 were added to avoid this limitation. Philip Labombarde experienced considerable difficulty in getting the reissue allowed. All of the reissue claims were twice rejected. On May 15, 1963 he appealed to the Board of Patent Appeals and filed a brief. On April 2, 1965 the Patent Examiner, who had originally rejected the reissue claims, apparently withdrew all objections and the patent was reissued on June 8, 1965.
 
 
 13
 (2) Court Proceedings
 
 
 14
 On January 20, 1966 International filed a complaint against Specialty in the district court, charging Specialty with infringement of both the Philip Labombarde reissue patent and the Raymond Labombarde patent. Regarding the Philip Labombarde patent, International accused Specialty of infringing claims 3, 13, and 14. Defendants, on April 22, 1966, filed an answer and counterclaim, denying infringement and alleging several reasons why the patents were invalid. After a trial without jury the district court entered its opinion and decree on December 6, 1968. The court held that claims 3, 13 and 14 were all valid; Specialty appeals this ruling. The court also held that defendants had infringed all three claims, but that, under 35 U.S.C. § 252, defendants had acquired intervening rights with regard to claims 13 and 14 and decreed that defendants could "continue to make, vend and use the device covered by said claims 13 and 14 without liability to the plaintiffs." Defendants appeal the court's findings on infringement. Plaintiffs-appellants allege that the court erred in failing to exercise its discretionary powers regarding continued manufacture. Defendants also appeal the denial of their application for counsel fees and the dismissal of their counterclaim.
 
 
 15
 Coming first to claim 3 of the reissue patent, the district court, after finding that its prescription was limited to a "narrow emission aperture", concluded that the weir type tanks used by Specialty on all coaters since November 1963 did not infringe. We agree. The district court was warranted in finding a material distinction between a weir type tank and a tank having "narrow emission aperture", not only by reason of the specification — which clearly described the latter — and the different connotations of the language, but also because of the teaching of prior art.[2] See, Reiner v. I. Leon Co., 324 F.2d 648, 651 (2d Cir. 1963).
 
 
 16
 The court also held that claim 3 was valid and that some of Specialty's tanks did for a time infringe, although the number of such tanks and resulting damages are said to be small. Perhaps it was because of this that the issue of the validity of claim 3 did not loom large in the proceedings below. But we are required to deal with it. As will be seen, our disposition of this issue has bearing on our view of claims 13 and 14.
 
 
 17
 The district court based its conclusion as to validity on the following reasoning:
 
 
 18
 "It seems to me that reheating only the top layer of wax on a cardboard box blank and then quenching it under a gentle low cold waterfall accomplished a new and useful result, that is to say, a paper box of superior gloss with superior impermeability to water, required an exercise of the inventive faculty above the ordinary skill of the art, and that the concept of reheating only the top layer of wax on the top surface of the paper box blank and then quenching under a low gentle cold waterfall was not known, shown or foreshadowed by the prior art."
 
 
 19
 We take no issue with these remarks. But they do not, in our mind, settle the question of the validity of claim 3. They are fully as pertinent to the original elements of claim 2, filed as claim 13 on December 28, 1959.[3] The problem with claim 3 arises from the fact that it was filed as an added claim on September 1, 1961. Its avowed purpose, when filed, was simply "to further distinguish from the patents cited and to further emphasize the thin, controlled layer of coating composition secured by roll coating in combination with remelting into a horizontal pool and then quenching the pool without marking the coating." As reference to footnote 2 indicates, the only further emphasis related to the thinness of coating lies in adding to the commonly described result of a liquefied thin layer with mirror-like level surface the advice to begin with a thin uniform coating.[4] This seems to us a nuance which could have been accomplished by amending what became claim 3 with a word or two, something falling short of the dignity of a new claim.
 
 
 20
 The real import of the new claim, unstated at the time, lies in the fact that claim 3, unlike the earlier claims, encompassed only four functions: advancing or feeding, coating, remelting, and quenching. The others called for the additional function (between coating and remelting) of smoothing. Smoothing was explicitly incorporated in 9 of the 13 original claims and in a 14th claim subsequently added (the remaining 4 original claims were directed to other details). The smoothing zone and apparatus were part of the three comprehensive drawings in both the original and reissue patent. Smoothing was the subject of refining amendments in January 1961 to several claims in response to the examiner's objections. Nine months later the entire function disappeared without ceremony in what was to become claim 3. A study of the file wrapper reveals no comment by patentee or examiner relating to the dropping of a step in the process. Only at trial was it revealed that the reason for this action was that "The machine that they [International] were then making was not covered by the claims as we had worded them, and, also, that the Specialty machine was on the market at that time." International had in fact sold a coating machine excluding a smoothing zone to a customer almost thirteen months before claim 3 was filed and over four months prior to filing the original application.
 
 
 21
 While the argument as to validity below centered on whether this was a "late claim", barred by Muncie Gear Works, Inc. v. Outboard Marine & Mfg. Co., 315 U.S. 759, 62 S.Ct. 865, 86 L.Ed. 1171 (1942) and 35 U.S.C. § 102(b), we face the preliminary question whether claim 3 — even in the absence of any prior public sale or use — was effective in adding to the patent a claim for a four-step process. It seems to us that International is impaled on the horns of a dilemma.
 
 
 22
 Despite the absence of any justification for the dropping of a function in the Patent Office proceedings, the filing of the claim for the reasons asserted at trial would indicate that the patentee was seeking to cover an invention disclosed but not yet claimed. That a new and smaller combination, omitting a step in a process, can be patentable has long been the law. Lawther v. Hamilton, 124 U.S. 1, 8 S.Ct. 342, 31 L.Ed. 325 (1888). See also Milcor Steel Co. v. George A. Fuller Co., 316 U.S. 143, 62 S.Ct. 969, 86 L.Ed. 1332 (1942) and United States Industrial Chemicals, Inc. v. Carbide & Carbon Chemicals Corp., 315 U.S. 668, 62 S.Ct. 839, 86 L.Ed. 1105 (1942). On this theory, however, it is not enough to drop a function, sub silentio, teaching the public nothing as to when, why, or how to use a four-step process as opposed to a five-step process. International's patent is stated to deal with coating compositions containing from 10 to 40 per cent of polyethylene. It has argued that the smoothing process has as its purpose the removal of "crow's-foot" marks "believed" to be caused by polyethylene and that a smoothing zone was therefore not held out to be necessary when little or no polyethylene was used. But International had had over a year in which a four-function machine had operated. It conceivably knew something of the materials on which it would perform. Yet it added no drawings, or specification material, contenting itself with unexplained deletion. If the new combination was patentable, 35 U.S.C. § 112 was not complied with.
 
 
 23
 The alternative theory could be that dropping a step in the process was merely "omitting a function of an earlier machine because some change in technology has made the function no longer necessary * * * [and therefore] only a mechanic's expedient." Shu-Conditioner, Inc. v. Bixby Box Toe Co., 294 F.2d 819 (1st Cir. 1961). If this were the situation, there would have been no occasion to seek a new claim, for Specialty could not have avoided liability for infringement of the earlier claims. In fact, however, the seeking of the claim for the reasons stated at trial constitutes in effect an admission that omitting a function here was not merely a mechanic's expedient. Moreover, we have been unable to find any evidence in the record that technological change had made the smoothing function unnecessary. If indeed such change had occurred, we have no explanation why the original claims for a five-step process were filed after a machine embodying a four-step process had been sold.
 
 
 24
 On either view, therefore, claim 3 fails. We recognize the presumption of validity ordinarily attaching to a patent, but cannot escape the conviction that the examiner did not consider the significance of the elimination of a step in the process. Nor, as we have indicated, did the district court.
 
 
 25
 This brings us to the reissue claims, 13 and 14. The district court held them to be valid on the same reasoning that led it to uphold claim 3. It construed the claims to cover a weir type water box but held that § 252 gave Specialty the protection accorded those with intervening rights. We do not reach the issue of intervening rights. Claims 13 and 14 were proffered in order to overcome the alleged inadvertence of claim 3's describing too narrow a compass. Whereas claim 3 covered a shower with a "narrow emission aperture", claims 13 and 14 simply described a "shower extending transversely" across the width of the coated blanks to direct "an unbroken sheet of quenching liquid in the form of a low waterfall". These claims have been challenged by Specialty as being late claims, broadening claim 3, and being made more than a year after International sold its machine to Burd and Fletcher. We do not reach this latter issue either, since, on the reasoning we have applied to claim 3, we feel compelled to declare reissue claims 13 and 14 invalid.
 
 
 26
 Claims 13 and 14, like claim 3, call for a four step process; they differ from claim 3 only in that they delete the phrase "having a continuous, narrow emission aperture" as a limitation of "shower". If, as we have held, claim 3 is invalid, claims 13 and 14 cannot survive. If anything, they are additionally vulnerable insofar as they purport to include a weir type device, since International first began to market such devices over a year before the reissue claims were filed.[5] There also seems to us to be substantial problems of anticipation or at least obviousness raised by the prior art, particularly the Cree patent, No. 2,732,319.[6] These issues, however, need not be further explored.
 
 
 27
 The Raymond Lambombarde Patent, No. 3,202,532.
 
 
 28
 International has also charged that Specialty had infringed its claims 33, 34, and 36 of its Patent 3,202,532. These claims in essence called for a one step coating process, wherein top and bottom rolls simultaneously applied coating material, followed by a passage through two rolls, the top one of which was a reversely moving burnishing roll and the bottom one a "blank-advancing roll at a temperature well below the melting point of said composition" or "a chilled forward roll contact with" the lower surface.
 
 
 29
 Specialty's allegedly infringing machines, first sold in May 1964, embodied a single pass coating process and a subsequent burnishing step in which the carton material passed under a burnishing roll and over a rubber surfaced forward advancing roll. The claims in question were filed in May of 1964 as a continuation of International's original patent and were subsequently allowed.
 
 
 30
 The district court noted that the invention was "asserted to lie in the smooth chilled advancing roll which hardens and grips the wax coating on the underside of the blank and forces the blank along against the counter force of the reverse rotating roll on top." It held that both because of the specification and a prior art patent (Pierce et al., No. 3,011,913) which had disclosed a rubber surfaced advancing roll, the claims in issue were limited to some form of chilled metal. It therefore concluded that Specialty's silicone rubber coated advancing rolls did not infringe. It further held that the claims were valid.
 
 
 31
 While Specialty endorses the district court finding of non-infringement, it would add another ground for that finding. More importantly, it contends that the claims are invalid as being late, indefinite, and obvious.
 
 
 32
 We agree with the district court on both non-infringement and validity. As to the former, we first ask the question: what do the claims cover? They were addressed, not to the nature of the advancing roll, but to the idea that both the top and bottom surfaces of carton blanks could be coated simultaneously. In the eleven earlier claims which purported to describe the process, there had always been a reference to passing the blanks through one pair of rolls to coat one surface and subsequently passing them through another pair to coat the other surface. International was complaining of "free riders" who would forward roll coat both faces in a single nip, with the glossing step following. This was the entire thrust of the justification, with the exception of one remark that International was "not aware of any use of a chill roll for the purpose of moving individual blanks through a reverse glossing roll nip."
 
 
 33
 The district court was clearly justified in holding that the Raymond Labombarde patent was confined to a forward advancing roll of metal. The original claims, specifications, and drawings specifically referred to "steel" advancing rolls.[7] The file wrapper reveals a vigorous resistance to the examiner's citing of the Pierce patent which had disclosed a chilled forwardly advancing roll preferably of rubber.[8] Of more significance, it was within the discretion of the district court to accept the trial testimony of Specialty's general manager that its machines did not utilize chilled rolls to advance the blanks. Especially relevant are the following excerpts:
 
 
 34
 "Q. Do you have chilled rolls in this EXEC coater?
 
 
 35
 A. We have chillable rolls. In other words, we don't use them chilled unless we have to, and I haven't seen any time when we had to.
 
 
 36
 * * * * * *
 
 
 37
 The rubber in itself is a very, very good insulator, and we can't see, and haven't been able to prove it to ourselves, that enough chill can pass through that rubber to cool that roll sufficiently in comparison with the amount of heat that it is getting from the above roll, to ever set your wax and do you any good that way.
 
 
 38
 * * * * * *
 
 
 39
 The Court: Now, you used the rubber coating on these rolls in order to provide a friction to move the box blanks through against the counter-rotation of the burnishing rolls?
 
 The Witness: That is right."[9]
 
 40
 We therefore affirm the district court's construction of the Raymond Labombarde patent as being confined to advancing rolls of metal, such as steel, or at least to rolls principally of metal, so chilled that the chilling is what supplies the adhesive function. So construing the patent, we also affirm the court's conclusion that Specialty has not infringed any of the three claims in issue. This is a narrow and busy field; we do not easily imply an expanded scope — particularly in view of the specific references to steel or other metal in the patent papers and the careful distinguishing of prior art.
 
 
 41
 But while International's claims are to be narrowly construed, we deem them valid. Specialty's attempt to invoke the Muncie Gear doctrine here palpably fails. Specialty blandly urges as a basis for prior use a proposed finding by International that the latter had sold the machine covered by the Raymond Labombarde patent since 1961. But there is no showing that any machine so sold by International coated both sides with a single pass. Specialty did go into commercial production with such a process — but only a matter of weeks before International filed its last four claims. Its previous work on a single pass coating process was concededly experimental. And International is quite correct in saying that its Figure 10 adequately disclosed the truncated process.
 
 
 42
 Specialty's contentions that the claims are invalid for indefiniteness and obviousness are without merit. The lack of a scraper blade on a burnishing roll is the omission of, as the district court said, "a mechanic's expedient". The case for obviousness was attempted to be made by citing patents which prefigured to some extent each of the processes disclosed in the claims. But we have quoted the district court's view of the essential thrust of the invention — "the smooth chilled advancing roll which hardens and grips" the underside and forces it forward against the competing rolling action on the top. This, if we understand the importance of using a chilled metal roll, was novel, useful, and not obvious. The claims, having been allowed, have a presumption of validity, which is strengthened by the holding of the district court. We cannot say that its findings as to the Raymond Labombarde patent are clearly erroneous.
 
 
 43
 Finally, the request of Specialty for attorney's fees is without merit. There is lacking here the extraordinary situation which compelled us to award such fees in General Instrument Corp. v. Hughes Aircraft Co., 399 F.2d 373, 380-381 (1st Cir. 1968).
 
 
 44
 That part of the judgment which held valid and not infringed claims 33, 34, and 36 of the Raymond Labombarde patent, No. 3,202,532, is affirmed. The district court's dismissal of defendant's counterclaim is also affirmed.
 
 
 45
 That part of the judgment holding valid and infringed claims 3, 13 and 14 of the Philip Labombarde patent, No. Re. 25,792, is reversed and the case remanded to the district court with directions to enter a decree in accordance with this opinion.
 
 
 46
 The district court's denial of counsel fees is also affirmed.
 
 
 
 Notes:
 
 
 [1]
 At some time not clear to us Specialty began using the same kind of sluice device embodied in International's machines
 
 
 [2]
 The Cree patent, No. 2,732,319,see n. 6 infra, called for a weir type tank cooling device.
 
 
 [3]
 A slightly truncated columnar comparison of the features of claim 2 and claim 3 is as follows:
 Claim 2 Claim 3

1. Means to advance box blanks Same.
 along a horizontal path.

2. Means along said path to apply Means along path to apply thin coating
 hot melt coating composition. of hot melt wax coating composition
 in thin layer of uniform thickness.

3. Heated means further along None.
 path for smoothing said coatings.

4. Gas burners mounted above Substantially same.
 path for liquefying a thin top [Heated means above path for remelting
 layer of coating into mirror-like and liquefying the thin layer
 level pool with high gloss surface. into mirror-like level pool with high
 gloss surface.]

5. Quenching means comprising a Substantially same.
 shower having a continuous narrow
 emission aperture.
 
 
 [4]
 Claim 1 (filed originally as claim 12), called for "applying a relatively thin hot melt wax coating composition to said blanks."
 
 
 [5]
 International had designed a weir type device by January 9, 1962. Philip Labombarde testified that this was "about the time" International began to market the device. Reissue claims 13 and 14 were applied for on May 15, 1963
 
 
 [6]
 This patent showed a weir type waterfall coolant device differing from that required by International's machines only in that the water falls on an inclined plane along which the substance to be coated moves
 
 
 [7]
 To begin with, the specification refers to one of the two advancing rolls (No. 51) as "of steel" and to the other (No. 70) as of "metal such as steel". Then several of the final claims (Nos. 2, 12, 25, and 26) described steel as the substance of the forwardly rotating rolls. A further scrutiny reveals that five key drawings illustrating the invention (Figures 7-11) all labelled the critical rolls 51 and 70 as of "chilled steel". Even when the last four claims were added in continuation, they were submitted "to cover the teaching of Figure 10", with no effort to delete the "chilled steel" label on that drawing
 
 
 [8]
 International responded at one point: "Pierce relies on friction material such as rubber, coupled with a high speed feed, to advance blanks through the nip while applicant uses neither and relies on the grip of chilled, smooth hard metal." At another point International argued that Pierce did not teach "that a smooth metal roll, if sufficiently chilled, will drive the blanks through the nip."
 
 
 [9]
 While there was contradictory testimony from this witness in a prior deposition, International made no attempt to utilize it in cross-examination for impeachment purposes at trial